# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

| | | |
|---|---|---|
| **RICHARD MAHANEY and** | ) | **CIVIL ACTION NO.  5:15-cv-02710** |
| **SUZI MAHANEY** | ) | |
| | ) | |
| **VERSUS** | ) | **JUDGE FOOTE** |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | **MAGISTRATE JUDGE HAYES** |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS…... …………………………………………………………..i

TABLE OF AUTHORITIES…………………………………………………………...ii

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMURY JUDGMENT……………………………………………………………………………1

    I.      FACTUAL BACKGROUND……………………………………………..…….2

          A.  Drs. Smith and Haydel's affiliation with the VAMC………………….…..2

          B.  Mr. Mahaney's anterior cervical discectomy and fusion (ACDF) procedure...4

    II.     PROCEDURAL HISTORY...………………………...…………………...…..7

    III.    LEGAL STANDARDS

          A.  Summary Judgment Standard…………………………………………8

          B.  Louisiana Medical Malpractice Law...………………………………….9

    IV.    ARGUMENT…………………………………………………………11

          A.  Under Louisiana law, supervising physicians are absolutely liable for injury resulting from residents' actions under their direct control…………………11

          B.  Based upon plaintiffs' expert reports, the only medical judgment at issue in this case is that of Dr. Smith; the U.S. cannot be liable as a matter of law……….14

    V.     CONCLUSION………………………………………………………...…...19

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................... 9

*Arbaugh v. Y&H Corp.*,
    380 F.3d 219 (5th Cir. 2004) ..................................................... 9

*Baird v. Sickler*,
    433 N.E.2d 593 (Oh. 1982)...................................................... 13

*Bazan v. Hidalgo Cnty.*,
    246 F.3d 481 (5th Cir. 2001) ..................................................... 9

*Buchheim v. Sanghavi*,
    299 A.D.2d 229, (N.Y. App. Div. 1st Dep't. 2002)................... 18

*Byrd v. La. Dept. Pub. Safety and Corr.*,
    637 So.2d 114 (La. 1994) ........................................................... 9

*Cangelosi v. Our Lady of Lake Reg'l Med. Ctr.*,
    564 So.2d 654 (La. 1990) ......................................................... 10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................... 9

*Cook v. Reisner*,
    295 A.D.2d 466 (N.Y. App. Div. 2d Dep't. 2002) ................... 18

*Felice v. Valleylab, Inc.*,
    520 So.2d 920 (La. 3 Cir. 1987) .............................................. 17

*Ferrell v. Minden Family Care Center*,
    704 So.2d 969 (La.App. 2 Cir. 1997) ....................................... 10

*Filippone v. St. Vincent's Hosp. and Med. Ctr. of N.Y.*,
    253 A.D.2d 616 (N.Y. App. Div. 1st Dep't. 1998).................. 18

*Gordon v. Louisiana State University Bd. of Sup'rs*,
    669 So.2d 736 (La.App. 2 Cir. 1996) ....................................... 10

*Hatahley v. United States*,
   351 U.S. 173 (1956) ............................................................................... 9

*Little v. Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) ................................................................ 9

*Maddox v. United States*,
   770 F.Supp. 320 (W.D.La. 1991) ......................................................... 9

*Martin v. E. Jefferson Gen. Hosp.*,
   582 So.2d 1272 (La.1991) ..................................................................... 10

*Ogletree v. Willis-Knighton Mem'l Hosp.*,
   530 So.2d 1175 (La. App. 2 Cir. 1988) ................................................ 10

*Parmelee v. Kline*,
   579 So. 2d 1008 (La. App. 5 Cir. 1991) ............................................ 11, 16

*Richard v. Wijayasuriya*,
   645 So. 2d 708 (La. App. 3 Cir. 1994) ................................................. 10

*Roseingrave v. Massapequa Gen. Hosp.*,
   298 A.D.2d 377 (N.Y. App. Div. 2d Dep't. 2002) ................................ 18

*Sewell v. United States*,
   629 F.Supp. 448 (W.D. La. 1984) ......................................................... 10

*Soto v. Andaz*,
   8 A.D.3d 470 (N.Y. App. Div. 2d Dep't. 2004) .............................. 17, 18

*United States v. Mitchell*,
   463 U.S. 206 (1983) ................................................................................ 2

*United States v. Orleans*,
   425 U.S. 807 (1976) ................................................................................ 2

## **STATUTES**

28 U.S.C. § 2671 ................................................................................................................. 2

28 U.S.C. §  2674 ................................................................................................................ 9

La. R.S. 9:2794(A) .............................................................................................................. 9

Louisiana Civil Code Article 2320 .................................................................................. 13

Fed. R. Civ. P. 56(a) ........................................................................................................... 8

## **OTHER AUTHORITIES**

Reuter, Stewart R.,
      15 J. Legal Med. 485 ............................................................................................... 3, 5

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | | |
|---|---|---|
| RICHARD MAHANEY and | ) | CIVIL ACTION NO.  5:15-cv-02710 |
| SUZI MAHANEY | ) | |
| | ) | |
| VERSUS | ) | JUDGE FOOTE |
| | ) | |
| UNITED STATES OF AMERICA | ) | MAGISTRATE JUDGE HAYES |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Richard Mahaney underwent an anterior cervical discectomy and fusion (ACDF) surgery to correct a disc herniation on May 13, 2011 at the Overton Brooks VA Medical Center (VAMC). The procedure was performed by neurosurgeon Dr. Donald Smith, assisted by neurosurgery resident Dr. Justin Haydel. Pursuant to the Federal Tort Claims Act (FTCA), plaintiffs allege negligence by VA providers during the spine surgery resulted in paraplegia.

There is no dispute among the parties that resident Dr. Haydel was a VA employee for purposes of this FTCA action, but Dr. Smith was not. Despite being aware of Dr. Smith's status as an independent contractor, plaintiffs did not pursue any claims against Dr. Smith individually. Plaintiffs only sued the United States for Dr. Haydel's involvement. Now, plaintiffs criticize the technique and instruments used during the surgery – all decisions made solely by Dr. Smith. The United States cannot be liable for Dr. Smith's alleged negligence.

Defendant is sympathetic to the unfortunate outcome Mr. Mahaney suffered.  However, plaintiffs pursue their claims against the wrong medical provider. If any negligence caused Mr. Mahaney's injuries, it was a direct result of Dr. Smith's independent medical judgment, not the

actions of Dr. Haydel. As a resident, there is nothing Dr. Haydel could have done differently to prevent Mr. Mahaney's injury without disobeying his supervising physician. Thus, under Louisiana law, Dr. Smith is absolutely liable for any alleged negligence. The United States respectfully moves for summary judgment in its favor, as there are no genuine issues of material fact remaining as to care by Dr. Haydel or the VAMC.

## I.  Factual background.

The factual background is set forth in the defendant's separately filed statement of material facts, and is also discussed below as relevant to the arguments herein.

### a.  Drs. Smith and Haydel's affiliation with the VAMC.

The United States, as a sovereign, is immune from suit, except when it consents to be sued. *United States v. Mitchell*, 463 U.S. 206 (1983).  The Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq.*, is a limited waiver of immunity allowing recovery for injury caused by negligent employees of the Government while acting within their scope of office or employment. *United States v. Orleans*, 425 U.S. 807, 813 (1976).

Neurosurgeon Dr. Smith performed surgeries at the VAMC pursuant to a contract between the VAMC and Louisiana State University Health Sciences Center School of Medicine (LSU). (VAMC-LSU Neurosurgery Contract, Exhibit A). As is common for VA facilities, the contract provided compensation to LSU for staffing the VA neurosurgery clinic with one if its board certified neurosurgeons once per week. The contract also allowed LSU neurosurgeons to operate at the VAMC. (*Id.* at 4). The contract expressly stated that LSU neurosurgeons (Dr. Smith) were not employees of the VAMC. (*Id.* at 13 ("The parties agree that the contractor shall not be considered a VA employee for any purpose.")). Upon information and belief, the VA informed plaintiffs that Dr. Smith was not an employee during the administrative claim process. As plaintiffs

2

have avoided criticizing Dr. Smith by name in this litigation, it appears they do not dispute Dr. Smith's status as an independent contractor. (Compl., Doc. 1). Instead, plaintiffs attempt to blame resident Dr. Haydel for the injuries sustained.

The VAMC had a separate contract with LSU which permits residents at LSU to train at the VAMC under supervision. (VAMC-LSU Institutional Contract, Exhibit B). Dr. Haydel was a resident in the LSU neurosurgery department, and was rotating through the VAMC under the supervision of Dr. Smith at the time of the events in question in this lawsuit. He was not privileged or credentialed to operate or practice neurosurgery independently at the VAMC.

In May of 2011, Dr. Haydel was in his third year of a seven-year neurosurgery residency at LSU. (Haydel Dep., at 11, Exhibit C). He had completed medical school at Louisiana State University School of Medicine in 2008. (*Id.* at 22).[1] Dr. Haydel worked under Dr. Smith's supervision routinely at LSU and the VAMC, including assisting with surgical procedures. He was never the primary or sole surgeon on a case. (*Id.* at 14-17). One of his attending physicians would always be present for the significant portions of procedures. (*Id.* at 15).

Although a resident has a medical degree, he/she is in a transitory period into a more complex specialty.[2] To practice neurosurgery independently, a physician must complete a residency program. The Accreditation Council for Graduate Medical Education (ACGME) accredits and sets standards for residency and fellowship programs in the United States. The ACGME requires neurosurgery residencies to implement supervision policies. (ACGME Guidelines, Exhibit D). While residents are technically physicians, they are not granted unfettered

---

[1] Since the incidents at issue in this lawsuit, Dr. Haydel has completed his residency, and completed a fellowship at Stanford University in spine surgery.

[2] For additional background information regarding attending and resident physician relationships, *see* Reuter, Stewart R., 15 J. LEGAL MED. 485, *Professional Liability in Postgraduate Medical Education: Who Is Liable for Resident Negligence?* 1994.

independence. Residents are expected to have some independent ability to make treatment decisions for patients, but the judgment of the supervising physician is paramount.

Dr. Smith's contract with the VA required him to supervise neurosurgery residents in accordance with the VHA Handbook. (Ex. A at 17 (citing VHA Handbook 1400.1, Exhibit E ("[T]he ultimate responsibility for the patient, oversight of the care delivered, and for compliance with the provisions of this Handbook reside with the supervising practitioner."))). The Handbook tasks the supervising physicians with determining each resident's appropriate level of supervision for any given task. For example, the Handbook states:

> The supervising practitioner directs the care of the patient and provides the appropriate level and intensity of supervision based on the nature of the patient's condition, the likelihood of major changes in the management plan, the complexity of care, and the experience and judgment of the resident being supervised. **All patient care services must be rendered under the supervision of the responsible practitioner or must be personally furnished by the supervising practitioner.**

(Ex. E at 19).

Thus, under the express terms of the contract between the VAMC and LSU, Dr. Smith was responsible for directing patient care and supervising Dr. Haydel. Particularly if Dr. Haydel were assisting with any operative procedure, Dr. Smith was required to discern the complexity of the procedure and provide appropriate supervision based upon his medical judgment. (*Id.* at 3).

### b.  Mr. Mahaney's anterior cervical discectomy and fusion (ACDF) procedure.

Richard Mahaney presented to the VAMC Neurosurgical Clinic with complaints of pain and numbness in his upper extremities. (VAMC records, Exhibit F). He had been to the ER in the weeks prior with similar complaints, and his symptoms were worsening. Dr. Smith, with Dr. Haydel present, evaluated Mr. Mahaney and ordered radiology studies. The MRI revealed a herniated cervical disc at C5–C6 and C6–C7. At Dr. Smith's recommendation, Mr. Mahaney

4

elected to undergo an anterior cervical discectomy and fusion (ACDF) to correct the herniation. The procedure was scheduled for May 13, 2011. (*Id.*)

An ACDF procedure involves removing the damaged cervical disc and replacing it with a bone graft or synthetic material. Generally, an incision is made through the front of the throat to access the anterior spine. The surgeon dissects down through the muscle and the tissue surrounding the spine to expose the intervertebral disc. The surgeon extracts the damaged disc using a drill, and replaces the disc. There are different techniques and drills used by surgeons to perform this procedure. Dr. Haydel had operated with Dr. Smith many times before, and had assisted with 30-40 ACDF procedures prior to Mr. Mahaney's surgery. (Ex. C at 15).

In Mr. Mahaney's case, Dr. Smith discussed Mr. Mahaney's operative plan with Dr. Haydel in advance. On the day of the procedure, they presented to the OR at 8:28 a.m. (Ex. F). Once the procedure began, Dr. Smith left the operating room, and Dr. Haydel performed the initial part of the procedure as Dr. Smith had permitted on prior occasions. Dr. Haydel estimated he had performed the initial portion of the procedure approximately 20 times unsupervised. (Ex. C at 14-17). Dr. Haydel carried out the operative plan in accordance with Dr. Smith's direction and training. (*Id.* at 61). Dr. Smith did not return to the OR until 9:48 a.m. (Ex. F). In the operative note signed by Dr. Smith, it states, "Dr. Smith was present and available for all portions of the procedure." (Ex. F).

Dr. Haydel technically executed the procedure precisely as Dr. Smith had trained him. He made the initial incision, and dissected down to the cervical disc. He used a disc blade to incise the disc spaces. He then operated a Cloward drill to remove the initial portion of the cervical disc. (Ex. C at 24-26). Dr. Haydel always carried out the procedure the same way, using the Cloward drill, in accordance with Dr. Smith's directive. He had no leeway to alter the surgical plan without

Dr. Smith's approval. (Haydel Declaration, Exhibit G).

Dr. Haydel testified that he would typically do this initial portion of the procedure (removal of a portion of the cervical disc), then call Dr. Smith to the OR to complete the case. Dr. Smith would remove any posterior disc fragments (the material closer to the spinal cord) and the posterior ligament which surrounds the spinal cord, and replace the disc and place the hardware. (Ex. C at 27).

Of particular importance in this case is the use of the Cloward drill. A Cloward drill is a hand-powered device used to drill through disc and bone material. (*See id.* at Ex. 4 to Haydel Dep.). It has a stop that can be measured out to a preset length. The stop prevents the drill from cutting beyond a specific depth. (*Id.* at 32). The premeasured stop on the drill is held by a surgical assistant, while the surgeon holds the end of the Cloward drill and cranks the drill with the other hand. (*Id.* at 35-36). Using a Cloward drill is a technique which is considered somewhat controversial now. There are, and were at the time of Mr. Mahaney's procedure, electrically powered drills that can be operated under the visualization of a microscope. (*Id.* at 50). The Cloward drill requires the surgeon to drill blindly and rely on the preset stop to prevent drilling too far. (*Id.* at 30-37).

In this case, Dr. Haydel used the Cloward drill to complete the initial part of the disc removal. Dr. Smith always used the Cloward drill. (*Id.* at 16; Ex. G). Dr. Haydel had no choice but to follow Dr. Smith's direction in this respect. The stop was preset to 14 millimeters length because Dr. Smith's protocol is 14 millimeters. (Ex. C at 32; Ex. G). Dr. Haydel testified that he operated the drill in the same way he was taught. (Ex. C at 61; Ex. G). There were no noted complications with the function of the drill or with Dr. Haydel's operation of the drill. However, when Dr. Haydel removed the drill after drilling to 14 millimeters, per Dr. Smith's routine practice, he noticed a

possible spinal fluid leak. He immediately stopped and called Dr. Smith. (Ex. C at 28-29).

Dr. Smith confirmed when he entered the OR that the drill had been set at 14 millimeters as he directed. (*Id.* at 38). Using the microscope, Dr. Smith could visualize that the Cloward drill had pushed disc and ligament through the dura (membrane surrounding the spinal cord) into the spinal cord. At that point, they could not tell whether the spinal cord had actually been impacted. (*Id.* at 41). Dr. Smith used a high speed drill under microscopic visualization to complete the dissection of the disc. (*Id.* at 50). He removed the ligament and was able to visualize the dura. At that point, they could see through the microscope a tear in the dura from an osteophyte (bony outgrowth). (*Id.* at 52-55). They could not tell whether the disc material was in contact with the spinal cord. Dr. Smith removed the ligament and disc fragment protruding through the dura and was able to see that the cord was contused, or bruised. (*Id.* at 57-58). Dr. Smith completed the procedure.

Once Mr. Mahaney was awake, it was evident that he had suffered a spinal cord injury, but the extent was unknown. He was transferred to the Spine Center at the Houston VA for rehabilitation. Over time, Mr. Mahaney regained use of his extremities, with continued weakness. His cognitive function was not impacted. His ability to ambulate remains limited.

## II.     Procedural History

Plaintiffs presented their claims to the Department of Veteran Affairs in December 2012 pursuant to the FTCA. (SF-95, Exhibit H). Their administrative claim was formally denied in July 2015, and plaintiffs filed this suit against the United States on November 18, 2015. (Compl., Doc 1). Although plaintiffs initially raised allegations against Dr. Smith in their Standard Form 95, they did not raise specific claims against Dr. Smith in their Complaint herein. (*Id.*; Ex. H). By that time, plaintiffs were aware of Dr. Smith's status as an independent contractor. Plaintiffs did not file an

action against Dr. Smith in any other jurisdiction. By November 2015, any claims against Dr. Smith were likely time-barred under Louisiana prescription law.

Plaintiffs recently disclosed their expert reports. (Taylor Report, Exhibit I; Peterson Report, Exhibit J). Notably, their experts did not attribute Mr. Mahaney's injury to Dr. Haydel's independent medical judgment. Instead, plaintiffs' experts primarily criticize the use of the Cloward drill during the procedure. (*Id.*). Dr. Daniel Peterson is critical that this case was "relatively complicated" and such "complexity should have been deciphered prior to surgery." (Ex. J). He asserts that the surgery may have required additional dissection prior to operating the Cloward drill, and that the drill ultimately caused the injury. (*Id.*). Dr. Peterson explains that there are many methods to perform an ACDF, with the use of a Cloward drill being one of the techniques which has become "less and less common because it is destructive to bony end plates and because the Cloward drilling step is done essentially blindly." (*Id.*). He also alludes to the fact that Dr. Haydel should not have been unsupervised. (*Id.*).

Because claims against Dr. Smith are likely time-barred, plaintiffs tailored their criticisms to Dr. Haydel. (Compl., Doc 1). Yet, Dr. Smith trained Dr. Haydel to do the surgery in this manner, using the Cloward drill, and Dr. Haydel executed the operative plan as directed by Dr. Smith. Based upon plaintiffs' own experts' criticisms, the factual disputes in this case solely involve decisions made by Dr. Smith.

### III.   Legal Standards

#### a.   Summary Judgment Standard

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). An issue is considered "genuine" if it is "real and substantial, as opposed to merely

formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has done so, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

### b.  Louisiana Medical Malpractice Law

Under the FTCA, liability is decided under the law of the place where the act or omissions occurred. 28 U.S.C. §  2674; *Hatahley v. United States*, 351 U.S. 173 (1956). Liability is alleged under the FTCA; therefore, Louisiana law governs.

Under Louisiana statute, plaintiffs bear the burden in a medical malpractice suit to prove: 1) the applicable standard of care, (i.e., the degree of knowledge/skill possessed or care ordinarily exercised by physicians under similar circumstances); 2) that the defendant lacked this degree of knowledge or skill or failed to use reasonable care; and 3) that as a proximate result of this failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred. La. R.S. 9:2794(A); *Maddox v. United States,* 770 F.Supp. 320, 321 (W.D.La. 1991), *affd.,* 956 F.2d 264 (5th Cir. 1992); *Byrd v. La. Dept. Pub. Safety and Corr.,* 637 So.2d 114, 122 (La. 1994). Courts rely on expert witnesses in the medical profession to decide if a plaintiff's

burden is met. *Sewell v. United States*, 629 F.Supp. 448, 455 (W.D. La. 1984). Opinions from medical experts are needed to tell if defendant used reasonable care. *Martin v. E. Jefferson Gen. Hosp.*, 582 So.2d 1272 (La.1991).

Reasonable care does not require a physician to exercise the highest degree of care available. *Ferrell v. Minden Family Care Center*, 704 So.2d 969, 972 (La.App. 2 Cir. 1997) (citing La. R.S. 9:2794(C)). "A physician's conduct and professional judgment must be evaluated in terms of the reasonableness under the existing circumstances and should not be viewed in hindsight and in terms of results or in light of subsequent events. The mere fact that an injury occurred does not raise a presumption that the physician was negligent." *Id.*; *see also, e.g., Gordon v. Louisiana State University Bd. of Sup'rs*, 669 So.2d 736 (La.App. 2 Cir. 1996) (citing *Martin v. East Jefferson General Hospital,* 582 So.2d 1272 (La. 1991)).

Injury or a bad outcome does not create presumption of negligence. *Id.* For example, a neurosurgeon is not automatically liable when a surgical procedure results in paralysis. *See Richard v. Wijayasuriya*, 645 So. 2d 708, 714 (La. App. 3 Cir. 1994) (finding a neurosurgeon not liable for paralysis when "the heavy weight of the medical evidence was that the damage in this case was not attributable to fault on the part of any involved physician, but that it was due to a cause other than negligence."). Care is not analyzed in hindsight but in light of facts known at the time of treatment. *Ogletree v. Willis-Knighton Mem'l Hosp.*, 530 So.2d 1175 (La. App. 2 Cir. 1988). If another cause is as equally plausible as defendant's negligence, plaintiff will fail to prove it is more likely than not the injury arose from defendant's negligence. *Cangelosi v. Our Lady of Lake Reg'l Med. Ctr.*, 564 So.2d 654 (La. 1990).

It is important to note that the standard for medical malpractice is not whether a physician's action caused an injury. There are known risks associated with every surgical procedure, which

occur a finite percentage of the time, despite appropriate care by the physician.  Rather, the appropriate inquiry is whether the particular negligence complained of caused the injury. It is plaintiffs' burden to establish that a lapse in judgment, not merely a contemplated risk, caused plaintiffs' damages.

## IV.    Argument

Plaintiffs' experts are not critical of Dr. Haydel's independent medical judgment. They only criticize decisions made by Dr. Smith preoperatively – decisions that Dr. Haydel did not have discretion to change. This case is unique in that the cause of the spinal cord injury is purely speculative. The injury occurred during the surgery, but there was no mishap or error by Dr. Haydel for plaintiffs to point to as the cause. Plaintiffs do not allege that Dr. Haydel operated the drill incorrectly or made a surgical mistake. The injury occurred in spite of Dr. Haydel completing all surgical steps precisely as trained and directed by Dr. Smith.

Plaintiffs' experts opine that perhaps certain decisions regarding the operative technique or drill choice could have been made to alter this outcome. However, Dr. Haydel was a third-year medical resident at the time, carrying out the medical judgment of his supervisor. There was nothing Dr. Haydel could have done differently, without disregarding Dr. Smith's directive. While plaintiffs' experts raise many factual disputes as to Dr. Smith's decision-making, they note no genuine issues of material fact as to Dr. Haydel; thus, summary judgment is warranted in favor of the United States.

### a.   Under Louisiana law, supervising physicians are absolutely liable for injury resulting from residents' actions under their direct control.

In Louisiana, when a supervising physician controls the actions of a resident so that the supervisor could have prevented the alleged injury, the supervisor is absolutely liable. *Parmelee v. Kline*, 579 So. 2d 1008, 1020 (La. App. 5 Cir. 1991).

The relationship between a supervising physician (often referred to as an attending) and a resident is not governed by the traditional agency/employment principles *per se*, nor is the supervising physician always liable for acts of residents, as previously contemplated by the captain of the ship doctrine. Historically, the captain of the ship doctrine imposed liability upon a surgeon for his position rather than his level of control. That doctrine assigned responsibility to the primary physician regardless of the physician's ability to control the actions of nurses, residents and staff. Louisiana, as with most states, rejected the traditional captain of the ship doctrine. *Id.* at 1019-20 ("We reject the captain of the ship doctrine. The trend toward specialization in medicine has created situations where surgeons do not always have the right to control all personnel within the operating room."). In rejecting this doctrine, Louisiana adopted a control test – if the surgeon has actual control over the actions of medical personnel, the surgeon is absolutely liable for those actions. *Id.*

Louisiana jurisprudence applying this control test is sparse. This situation does not arise often. *Parmelee v. Kline* provides the most direction for applying this test. In *Parmelee*, plaintiff filed suit against a neurosurgeon, a neurosurgery resident and a hospital for wrongful death following a procedure. The resident and hospital settled pre-trial, and the trial proceeded against only the neurosurgeon. The jury assigned comparative fault among the providers – 40% to the neurosurgeon, 50% to the resident and 10% to the hospital. The trial court *sua sponte* entered a judgment against the neurosurgeon for 100% of the damages, imposing liability on the neurosurgeon for the actions of the neurology resident and hospital. The Louisiana Court of Appeals set aside the judgment.

*Parmelee* discussed at length the circumstances under which a supervising physician can be liable for the actions of a resident. In *Parmelee*, the neurosurgeon performed the procedure at

issue. He then left the operating room, and the resident closed the incision. The neurosurgeon left the hospital for the resident to oversee postoperative care. Plaintiff alleged that the resident failed to timely recognize postoperative complications and failed to notify the neurosurgeon for several hours. The delay allegedly resulted in paralysis and death. *Id.*

There was uncontroverted evidence that the neurosurgeon taught the resident to call him if certain postoperative complications arose. It was the resident's independent decision-making that allegedly caused the injury, not the supervising physician's instructions. There was no question that the resident was trained properly to detect postoperative complications. Thus, the neurosurgeon could not be liable for the acts of the resident in *Parmelee* under the control test. *Id.* However, the Court did not preclude absolute liability on supervising physicians under different circumstances.

The court in *Parmelee* referenced Louisiana Civil Code Article 2320, which imposes liability upon teachers/masters for the actions of their students/apprentices under certain circumstances.[3] The court also noted the national perspective: "A physician generally is not held liable for the acts or omissions of a hospital resident unless he is able to control the acts of that individual." *Id.* (citing 61 American Jurisprudence 2d (1981) 439 Physicians, Surgeons, and other healers, Section 289; *Baird v. Sickler,* 433 N.E.2d 593 (Oh. 1982) (finding that a surgeon could be held liable for the negligence of a nurse anesthetist in intubating a patient in surgery where the

---

[3] "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed. Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence. In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it." La. C.C. Art. 2320.

surgeon directed the nurse as to the procedure he wanted to be used.)). The *Parmalee* court concluded:

> In summary, the Louisiana jurisprudence has not favored the imposition of absolute liability for a surgeon who directs and controls the acts of others absent "immediate supervision and control." Similarly, a supervising physician should not be held absolutely liable for the acts of negligence of a resident absent a finding that "he might have prevented the act which caused the damage, and have not done it."

*Id.* at 1020. As applied herein, Dr. Smith controlled the methods and instruments used in this procedure. He dictated the way Dr. Haydel was to perform the procedure, and Dr. Haydel did not stray from his directive. Plaintiffs' criticisms are rooted in the plan for the procedure, not the execution. Thus, under the framework set forth in *Parmelee*, Dr. Smith fully controlled the procedure and his decisions were the only ones which might have prevented the injury.

> **b.  Based upon plaintiffs' expert reports, the only medical judgment at issue in this case is that of Dr. Smith; the U.S. cannot be liable as a matter of law.**

This case presents the convergence of direct control and causation articulated in *Parmelee* that imposes absolute liability upon the supervising physician. Dr. Smith exercised complete control over the technique and instruments used in Mr. Mahaney's ACDF procedure. He designed the operative plan and trained Dr. Haydel to execute that plan. Dr. Smith determined the complexity of the case and decided that Dr. Haydel was skilled enough to complete the initial portion of the procedure as a third-year resident. While Dr. Smith was not physically operating the Cloward drill, it was Dr. Smith who dictated when and how that device would be used. There is no evidence of any independent decisions or actions by Dr. Haydel causing plaintiffs' injury. (*See* Ex. C, Ex. G).

Whether any of Dr. Smith's decisions were negligent is not an issue before this Court. There are factual disputes regarding whether the use of the Cloward drill was appropriate, whether Dr. Haydel should have been supervised, and whether the complexity of this case required

complete removal of the disc prior to the use of the Cloward drill. (Ex. I, Ex. J). However, none of these disputes involve independent medical judgment by Dr. Haydel. He merely executed Dr. Smith's operative plan as he had done at least 20 times before. (Ex. C at 16; Ex. G). Dr. Haydel had no reason to doubt Dr. Smith's methods, nor did he have discretion to alter his plan. (Ex. G). As a resident, he was expected to perform the procedure as trained, with the drill selected by his attending.

Certainly, residents are physicians themselves and have varying degrees of independence in making treatment decisions for patients. Nevertheless, the specific criticisms alleged by plaintiffs' experts were nonnegotiable for a resident in Dr. Haydel's position.

Dr. Haydel testified:

Q:   Approximately how many of those 30 to 40 [ACDFs Dr. Haydel had participated in as a surgeon] would you estimate where you had been the person operating the Cloward drill?
A:   **There's different ways to do the procedure. Some of my attendings, or specifically just Dr. Smith, does the Cloward drill.** I had participated in approximately 20 surgeries in which we used the Cloward drill.. . . .
. . .
Q:   Now you mentioned in the Operative Report it talks about measuring the Cloward drill to a length of 14 millimeters. Explain that to me. How do you go about measuring the Cloward drill to that length?
A:   So the Cloward drill is just a hand-powered instrument. It has a stop on it. That stop can be measured out to be whatever length we want. The initial drilling is usually – **is always 14 millimeters with Dr. Smith. That is his protocol.** . . . [O]nce I initially did the 14 millimeters, I would never drill past that.
. . .
Q:   Do you admit that you were negligent in how the procedure was performed on Mr. Mahaney?
A:   . . . I didn't perform this procedure in any negligent way. **I did every step as I was taught**, as is described in the literature, and it had an unfortunate outcome in this incident. I wouldn't have done it any different had it been my mom of my brother on the table. It's just a very unfortunate outcome.

(Ex. C at 16, 32, 61). There is no evidence of record suggesting that Dr. Haydel had control over any of these crucial elements of the procedure.

For comparison sake, in *Parmelee* the resident had been instructed to timely notify his supervisor of certain postoperative complications, but failed to do so. It was the resident's decision that allegedly caused the injury. 579 So. 2d at 1013-15. To the contrary, Dr. Haydel executed the operative plan as directed by Dr. Smith. It is the treatment plan by Dr. Smith that is in dispute, not any actions by Dr. Haydel.

Plaintiffs' experts attribute causation to the use of the Cloward drill. (Ex. I, Ex. J). Dr. Chris Taylor's report simply concludes that the injury resulted "with the Cloward drill or due to the use of the Cloward drill." (Ex. I).  He notes no independent negligent action by Dr. Haydel in operating the Cloward drill. Dr. Peterson's report criticizes the use of the Cloward drill as well. He theorizes that the true complexity of this case was not properly contemplated prior to the surgery, and alludes to the fact that Dr. Haydel should not have been unsupervised. (Ex. J). These opinions that the operation should have been approached using a different method can only be construed as criticisms of Dr. Smith. Dr. Haydel had no discretion to alter his attending's operative technique.

In discussing the case after-the-fact, Dr. Haydel testified that he and Dr. Smith believed the Cloward drill, instead of cutting through the bone and disc material, pushed the material back into the dura (membrane surrounding spinal cord). (Ex. C at 44). Plaintiffs' experts seem to agree. Dr. Peterson concluded in his report, "The Cloward drill drove osteophyte and disc into the dura and spinal cord resulting in tetraplegia." Both parties agree that the Cloward drill likely caused this injury. Whether Dr. Smith was negligent in electing to use the Cloward drill in the manner described in this procedure is the true inquiry raised by plaintiffs' experts. Dr. Haydel could not have used a different drill. (Ex. G). This was Dr. Smith's surgical preference and operating on Dr. Smith's patients required conforming to his surgical techniques.

16

The case of *Felice v. Valleylab, Inc.*, 520 So.2d 920 (La. 3 Cir. 1987), also provides some guidance. In *Felice*, a third year general surgery resident was overseeing a family practice resident in performing a child's circumcision procedure. The surgery resident instructed the family medicine resident on the type of technique to be used for the procedure. However, the technique she chose was something she had only attempted once before and it had not been approved by her supervising physicians. The Louisiana appellate court upheld the finding that the surgery resident was negligent in modifying the circumcision technique, a technique which she had not been approved to use by her supervising attending physicians. *Id.*

Akin to *Parmelee*, the resident in *Felice* acted contrary to, or without permission from, her supervising physicians. Doing so was considered an independent negligent act by the resident, and released the supervisor from absolute liability. Unlike those cases, Dr. Haydel was acting precisely as directed by his supervisor. *Felice* and *Parmelee* reserve absolute liability for cases like this one, wherein the resident followed instruction and injury resulted. If the supervisor's instructions were negligent, then liability is imposed upon the supervisor, not the resident. This is consistent with the basic concepts of medical negligence as well. Plaintiffs must prove that a lapse in medical judgment caused Mr. Mahaney's injury. *See supra* Part III(b).  As the only medical judgment at issue is that of Dr. Smith, the U.S. cannot be liable in this case.

Other jurisdictions have come to similar conclusions. For example, in *Soto v. Andaz*, 8 A.D.3d 470, 471 (N.Y. App. Div. 2d Dep't. 2004), an appellate court upheld the dismissal of a resident from a medical malpractice action where the resident participated in a laparoscopic cholecystectomy. The only allegation against the resident was negligence in performing the procedure, as the resident was directed by the supervising physician. The New York appellate court noted, "A resident who assists a doctor during a medical procedure, and who does not

exercise any independent medical judgment, cannot be held liable for malpractice so long as the doctor's directions did not so greatly deviate from normal practice that the resident should be held liable for failing to intervene." *Id.* at 471 (citing *Cook v. Reisner,* 295 A.D.2d 466 (N.Y. App. Div. 2d Dep't. 2002); *Buchheim v. Sanghavi,* 299 A.D.2d 229, (N.Y. App. Div. 1st Dep't. 2002); *Roseingrave v. Massapequa Gen. Hosp.,* 298 A.D.2d 377 (N.Y. App. Div. 2d Dep't. 2002); *Filippone v. St. Vincent's Hosp. and Med. Ctr. of N.Y.,* 253 A.D.2d 616 (N.Y. App. Div. 1st Dep't. 1998)). The appellate court noted that the resident played an active role in the procedure. However, the resident was operating as instructed by the supervising physician, and thus the plaintiff could not establish that he was exercising any independent medical judgment. *Id.*

Plaintiffs have no evidence to prove that Dr. Haydel was exercising his own medical judgment during Mr. Mahaney's ACDF procedure. All evidence of record points to the contrary. It would be pure speculation to argue that Dr. Haydel made a medical decision which caused this injury. There is a notable divergence between cases where the supervisor's medical judgment is at issue, versus cases where the residents are exercising independent medical judgment. In the former, as in this case, the supervisors are absolutely liable for any injury.

Plaintiffs have made a concerted effort to tailor their criticisms to Dr. Haydel, since Dr. Smith is not a defendant. But plaintiffs cannot ignore the fact that Dr. Smith was orchestrating all of the care at issue in this lawsuit. Dr. Haydel was not the decision-maker in this case. He was merely carrying out Dr. Smith's operative plan as he was trained to do. Because Dr. Smith had control over the surgical plan, and Dr. Haydel merely executed that plan as directed, Dr. Haydel cannot be at fault, and the United States is entitled to summary judgment.

## CONCLUSION

Plaintiffs' criticisms focus only on the medical judgment of Dr. Smith. There is no evidence of record which shows that Dr. Haydel acted independently to cause plaintiffs' injury. To the contrary, the evidence confirms that Dr. Haydel executed Dr. Smith's operative plan as trained during Mr. Mahaney's procedure. Moreover, Dr. Smith was responsible for providing appropriate supervision and for directing patient care pursuant to the contractual agreement with the VA. The only actions that could have altered the outcome of this procedure were those by Dr. Smith. There are no remaining factual disputes as to Dr. Haydel and the VAMC, and the United States is entitled to summary judgment in its favor.

Respectfully submitted,

STEPHANIE A. FINLEY
UNITED STATES ATTORNEY

BY:    /s/ *Jennifer B. Frederick*
       JENNIFER B. FREDERICK (#23633)
       Assistant United States Attorney
       800 Lafayette Street, Suite 2200
       Lafayette, LA 70501
       Telephone:    (337) 262-6618
       Facsimile:    (337) 262-6693
       Email:        jennifer.frederick@usdoj.gov